KENT LOUIS KRAMER, JR., ET AL.

VERSUS

PETROLEUM HELICOPTERS, INC., ET AL.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 981262
HONORABLE JULES D. EDWARDS  III, DISTRICT JUDGE

**********

MARC T. AMY
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders and
Marc T. Amy, Judges.

AFFIRMED.

SAUNDERS, Judge, dissents and assigns written reasons.

Richard Broussard
Broussard & David
Post Office Box 3524
Lafayette, LA   70502-3524
(337) 233-2323
COUNSEL FOR APPELLANT/PLAINTIFF:
        Janice McLaud

Clayton A. L. Davis
Lundy & Davis
Post Office Box 3010
Lake Charles, LA   70602-3010
(337) 439-0707
COUNSEL FOR APPELLANT/PLAINTIFF:
        Janice McLaud

Tony B. Jobe
500 Water Street
Madisonville, LA   70447
(985) 845-8088
COUNSEL FOR APPELLANT/PLAINTIFF:
    Janice McLaud

S. Gene Fendler
Don K. Haycraft
Liskow & Lewis
701 Poydras Street, Suite 5000
New Orleans, LA   70139-5099
(504) 581-7979
COUNSEL FOR APPELLEES/DEFENDANTS:
    Eurocopter Deutschland GmbH
    American Eurocopter Corporation
    Messserschmitt-Boelkow-Blohm

Jamie D. Rhymes
Liskow & Lewis
Post Office Box 52008
Lafayette, LA   70505-2008
(337) 232-7424
COUNSEL FOR APPELLEES/DEFENDANTS:
    Eurocopter Deutschland GmbH
    American Eurocopter Corporation
    Messserschmitt-Boelkow-Blohm

Kenneth Hugh Laborde
Leo Raymond McAloon, III
Pulaski, Gieger & LaBorde
701 Poydras Street, Suite 4800
New Orleans, LA   70139-4800
(504) 561-0400
COUNSEL FOR APPELLEES/DEFENDANTS:
    United States Aircraft Insurance Group
    Janice McLaud
    Employers Insurance of Wausau

AMY, Judge

The plaintiff's husband was killed when the helicopter he was piloting crashed. She filed suit against the helicopter's manufacturer, alleging that the crash occurred when the pendulum weight mount to one of the helicopter's four rotor blades detached due to internal, composite material fatigue. The trial court granted the manufacturer's motion for involuntary dismissal, finding that the plaintiff failed to establish the existence of an unreasonably dangerous design or unreasonably dangerous defect in the construction or composition of the rotor blade. The plaintiff appeals. For the following reasons, we affirm.

## Factual and Procedural Background

This case arises from a March 14, 1997 crash of a Boelkow BO-105 helicopter owned and operated by Petroleum Helicopters, Inc. ("PHI"). The helicopter's pilot, Don McLaud, was an employee of PHI. Mr. McLaud died in the early morning crash, which occurred along Interstate 49 near Lena, Louisiana. Also on board was Kent Kramer, a flight nurse and paramedic for Acadian Air Med Services, which had contracted with PHI to use the aircraft for air ambulance services. Mr. Kramer sustained serious injuries in the crash.

The record indicates that the flight originated in Shreveport at approximately 1:00 a.m.. Its destination was Lafayette, the crew's home base. Mr. Kramer testified that Mr. McLaud informed him that they would fly along I-49 as a reference point. The factual report of the National Transportation Safety Board investigation indicates that "[i]nstrument meteorological conditions prevailed, and a company VFR flight plan was filed for the dark night cross country flight."

Mr. Kramer explained that, although the weather was clear when they left Shreveport, cloud cover increased as they neared Alexandria. He denied that they

entered the clouds. He stated that Mr. McLaud received weather advisories and began decreasing their altitude, ultimately descending to 500 feet, mean sea level. Mr. Kramer testified that Mr. McLaud discussed using the headlights of the Interstate traffic as a visual reference. In light of the conditions, Mr. Kramer spoke with his Acadian Air Med dispatcher about the possibility of spending the night in Alexandria.

However, Mr. Kramer explained that after Mr. McLaud spoke with air traffic control and, approximately ten to fifteen minutes from Alexandria, the crash sequence began with Mr. McLaud uttering an expletive. Mr. Kramer stated that he felt a vibration or shudder, which worsened, and that he could see orange sparks through the glass at the top of the helicopter. He described debris hitting him from behind and, although he did not recall descending, awakening in the darkened helicopter along the Interstate. He later found Mr. McLaud dead inside of the aircraft.

While the helicopter was found in an upright state, the roof of the cabin was separated from the fuselage and its four main rotor blades. The NTSB factual report described the four main rotor blades as "sheered off at the blade fittings near the root of the blade."

Mr. Kramer instituted the initial suit arising from the crash. The present appeal involves the cross-claim filed by Janice McLaud, Mr. McLaud's wife. She named Eurocopter Deutschland GmbH ("ECD"), the manufacturer of the BO-105, as a defendant and alleged that the crash occurred due to a manufacturing defect in the "green" main rotor blade,[1] which caused an in-flight separation of the blade's pendulum weight mount, a vibration dampening device, leading to the crash.

---

[1] The record indicates that the Bocal 105 was equipped with four, color-coded main rotor blades, including the green blade that was put at issue by the plaintiff.

ECD moved for an involuntary dismissal at the close of the plaintiff's case. Although the trial court initially deferred ruling on the motion, it ultimately granted the motion at the close of the defendant's case.

The plaintiff appeals and assigns the following as error:

1. The Trial Court committed manifest error by granting ECD's motion of involuntary dismissal.

2. The Trial Court committed manifest error by not considering all of McLaud's uncontroverted evidence presented in her case in chief, including both eyewitness and expert testimony.

3. The Trial Court committed legal and factual error by its application of the doctrine of res ipsa loquitur.

4. The Trial Court erred by considering issues of design defect in this case.

5. The Trial Court erred by considering evidence from the defendant's case in chief in granting the involuntary dismissal motion.

6. The Trial Court erred by excluding the live testimony of the two onground eyewitnesses whose testimony corroborated McLaud's theory of the case.

7. The Trial Court erred by rejecting Dr. Agarwal's expert testimony on the basis of a non-specific rejection of his methodology.

8. The Trial Court erred in rejecting Dr. Agarwal's testimony because Dr. Agarwal's accent made him difficult to understand.

9. The Trial Court erred by waiting until the close of all the evidence to announce it believed it had previously erred in qualifying Dr. Agarwal as an expert.

10. The Trial Court erred by qualifying Gerald Kuntze-Fechner as an expert in composites and failure analysis and in allowing him to testify regarding helicopter accident reconstruction, an area in which he was not recognized as an expert, nor had he been disclosed to McLaud prior to trial.

**Discussion**

*Involuntary Dismissal*

The plaintiff contests the involuntary dismissal, asserting that she established, by a preponderance of the evidence, that ECD was liable because the green rotor blade was unreasonably dangerous, in violation of the Louisiana Products Liability Act. *See* La.R.S. 9:2800.51, et seq. She asserts that she demonstrated that the pendulum weight mount detached from the green blade during flight, causing the green blade to leave its track and rendering the helicopter unsafe to fly. She contends that eyewitness and expert testimony support this view and exclude any other possible causes for the accident. She further contends that she proved that ECD was aware of technology that would have revealed the alleged manufacturing defect, internal fatigue damage which allegedly caused the separation of the pendulum weight mount.

Pertinent portions of the Louisiana Products Liability Act, 9:2800.51, et seq., provide:

**[9:]2800.52 Scope of this Chapter**

This Chapter establishes the exclusive theories of liability for manufacturers for damage caused by their products. A claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in this Chapter. Conduct or circumstances that result in liability under this Chapter are "fault" within the meaning of Civil Code Article 2315.

**[9:]2800.54 Manufacturer responsibility and burden of proof**

A. The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

4

B. A product is unreasonably dangerous if and only if:

(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;

(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;

(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or

(4) The product is unreasonably dangerous because it does not conform to the express warranty of the manufacturer about the product as provided in R.S. 9:2800.58.

C. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.

D. The claimant has the burden of proving the elements of Subsections A, B and C of this Section.

## [9:]2800.55 Unreasonably dangerous in construction or composition

A product is unreasonably dangerous in construction or composition if, at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the same manufacturer.

Involuntary dismissal is provided for by La.Code Civ.P. art. 1672:

B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.

On appeal, a trial court's ruling on a motion for involuntary dismissal is considered under the manifest error standard of review. *Gold, Weems, Bruser, Sues & Rundell v. Granger*, 06-859 (La.App. 3 Cir. 12/29/06), 947 So.2d 835, *writ denied*, 07-0421 (La. 4/27/07), 955 So.2d 687. We find that the record reveals no manifest error in the trial court's findings that the plaintiff failed to prove that "the green blade was produced with defective characteristics" and that she "presented no evidence that the green blade was released from the manufacturer with any characteristics outside of the design characteristics specified by the manufacturer or that those designed characteristics were inappropriate for the intended use of the green blade." In short, the record supports the finding that the plaintiff did not sustain her burden of proving that the crash was caused by the manufacturing error cited.

In particular, the evidence supports the trial court's determination that "the plaintiff has not proven that any part separated from this BO-105 while in-flight." The plaintiff makes the conclusory statement in her brief that "[g]iven the distance the pendulum weight mount part was found from the helicopter wreckage during the NTSB's investigation, it detached from the helicopter while in flight and at altitude." She notes that the weight mount part was found further from the wreckage than other portions of the aircraft and points to her expert's testimony who explained that, according to his calculations, the part would not have traveled as far if it had separated after the aircraft struck the ground. She contends that this demonstrates the in-air separation of the part from the green blade. However, the trial court could have permissibly found that the testimony did not establish the plaintiff's proposition. Rather, the testimony was based on hypothetical scenarios involving various altitudes, rotations per minute of the rotor blade, and the location of the weight mount

6

part when located. In light of the speculative nature of these factors, the trial court could have placed little, if any, weight upon the significance of its location. In short, no evidence required the trial court to conclude that it proved in-flight separation.

Further, the acceptance of the opinion of Dr. Bhagwan D. Agarwal was essential to the plaintiff's case insofar as she sought to prove in-flight separation due to a manufacturing defect. Dr. Agarwal, an expert in the fields of mechanical engineering, composites, and failure analysis of composite materials, testified that the alleged separation of the green blade's pendulum weight mount resulted from fatigue in the composite materials of the blade. He denied that the green blade was sheered due to impact load as he felt the other three main rotor blades were. He stated that any such damage began as an internal defect in the blade's composite material from the date of manufacture and could have been detected by appropriate testing which, he contends, was available to ECD at the time the blade was manufactured.

However, the trial court rejected Dr. Agarwal's opinion,[2]

---

[2] The trial court incorporated references to La.Code Evid. art. 702 in its extensive discussion and ultimate rejection of Dr. Agarwal's testimony, stating, in part:

> During the voir dire on the subject of Dr. Bhagwan D. Agarwal's qualifications he was unable to describe the evidence of fatigue failure in a manner that I could understand that he looked for when analyzing composite materials of the type [] used in the green blade. All we got was he knew what he was looking for and he would know it when he found it.
>
> . . . .
>
> Because Dr. Agarwal was unable to describe the reliability methodology employed in this particular during his voir dire in this case I would not have designated him as an expert witness if this were a jury trial. However because this was a bench trial and there was the potential for the court to obtain the advantage of authentic insights and innovations, I made a finding that the terms "de-lamination" and "fatigue" are terms of art in the field of the determination of composite failure, and further found on that basis that the methodology employed by this witness is reliable.
>
> It is important to note that Dr. Agarwal is a native of India and speaks the English language with a distinct accent. It appeared that there were some difficulties in the communications of Dr. Agarwal and the inquiring attorneys during his testimony. I assumed that during the course of his testimony on the merits he would provide a

7

more understandable definition of phenomenon that he used the words fatigue and delamination to describe.

During his post voir dire testimony, he still did not adequately explain the reliability of the indicators of fatigue damage that **he** was looking for when he initiated his analysis on the remnants of a separated composite that was used to construct the main rotor blades of the BO-105. Thus it appears that my recognition of him as an expert in the fields of mechanical engineering, composites and failure analysis of the composite materials was an error.

Dr. Agarwal[] testified that fatigue damage is something that occurs slowly over time. He described the visible evidence of fatigue damage in this type of composite as cracks, of two different types: de-lamination and de-bonding and that both are visible macroscopically & microscopically. Each of these words: cracks, de-lamination and debonding all explain different aspects of the same phenomenon.

When a fiber is separated from the epoxy, at the interface, it is called de-bonding, but it's still a crack or fracture. The interface is the space where the component materials of a composite, join or face each other. Cracks can occur in the epoxy itself. It is often difficult to determine if the crack is a crack in the epoxy or a separation of a fiber from the epoxy, but both of these types of cracks are called de-bonding.

De-lamination occurs when the crack occurs between two layers of fabric within the composite or when bundles of unidirectional fibers get separated. Fatigue damage produces de-lamination, de-bonding and cracking.

Dr. Agarwal also described the difference between effects of compression and tension forces on composite materials. Compression forces are applied when the composite material is bent. Tension fractures forces area applied when the composite material is pulled. Compression forces and tension forces may combine to produce a fracture.

Fatigue damage occurs over time as a result of forces applied to the material which reduce the material's integrity. Overload occurs when forces are applied to a material during one event which exceeds the material's capacity to maintain its integrity. Both fatigue damage and overload produce a separation of the material. However, fatigue damage is a much more gradual process. Metals are less resistant to this kind of damage than composites and once it initiates the damage propagates more rapidly in metals than in composites. Fatigue damage in metals is generally expressed in the form of a single crack. Fatigue damage in composites of unidirectional fiber and epoxy are generally expressed in multiple spider-like cracks.

Dr. Agarwal testified th[ese] cracks caused by fatigue damage occur initially on the interior of the composite material and are not visible on the surface of the composite material until it breaks a few seconds prior to the break. He further testified that ultrasonic testing is a nondestructive technique that can reveal the presence of subsurface cracks in composite materials. Dr. Agarwal testified the existence of fatigue damage to the green blade is violative of the manufacturers stated performance standards.

Dr. Agarwal testified visible damage caused by fatigue of unidirectional fiber composites will take the form of separated strands of fiber of irregular length. This damage is observable both microscopically and macroscopically. A one-time failure which results from overload would produce a break in which all of the fiber strands

explaining that the limited weight it accorded to his testimony began as early as the voir dire examination. Having considered both the extensive voir dire and Dr. Agarwal's testimony, we find no manifest error in the conclusion that the methodology underlying the expert's consideration and examination of the blade materials was unclear. As explained in *Green v. K-Mart Corp.*, 03-2495 (La. 5/25/04), 874 So.2d 838, a trier of fact may accept or reject an expert's opinion in whole or in part. Also, the trial court's evaluations are consistent with its role as

are of the same length. His book reports "the location of the break in individual fibers is a completely random event." When I observed the remnants of the main rotor blades I could not apply the standard of "separated strands of fiber of irregular length" to explain why Dr. Agarwal concluded the green blade failed as a result of fatigue and the red, blue, and yellow blades failed as a result o[f] the application of an overloading force.

Dr. Agarwal testified fatigue damage initiated at the root of the green blade at a position under the clamp near the cable eye and the resulting cracks propagated to the position where the pendulum weights are mounted on the green blade. The pendulum weights are mounted to the green blade with two brackets and four bolts. Those cracks exerted expansive forces on the green blade which flexed and that additional load separated the weight mounts from the bolts and the green blade and detached the pendulum weights from the green blade. However he also testified that he did not know the amount of force needed to break those bolts and cause the in-flight separation of the pendulum weights from the green blade.

Dr. Agarwal was able to look at the green blade and determine that he was observing the results of fatigue damage. Dr. Agarwal and the defense expert Gerard Kuntze-Fechner both testified that it is possible to distinguish the visible damage produced by fatigue and that which is produced by overload. However this court finds that the manner that Dr. Agarwal used to determine that the damage to the green main rotor blade that is the subject of controversy in this case was unreliable. The method used may work for him because he knows what he is looking for and he knows when he sees it. However, he was unable to describe to the court what he was looking for with sufficient specificity to allow the court to make that same kind of determination or conclude that someone else could use Dr. Agarwal's methodology and reach the same conclusions on a consistent basis.

Considering the entirety of Dr. Agarwal's testimony I am left with the choice of accepting or rejecting Dr. Agarwal's opinion that the green blade broke as a result of fatigue failure as opposed to the administration of a one-time force overload simply because Dr. Agarwal says this is so. While I accept the fact that he is convinced that his opinion accurately explains the failure of the green blade, that fact is insufficient to cause me to believe that his opinion accurately explains the failure of the green blade.

9

gatekeeper, which requires it to ensure that an expert has "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *State v. Foret*, 628 So.2d 1116, 1122 (La.1993), *quoting Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 592, 113 S.Ct. 2786, 2796 (1993).

In its ruling, the trial court observed that Dr. Agarwal "was unable to describe to the court what he was looking for with sufficient specificity to allow the court to make that same kind of determination or conclude that someone else could use [his] methodology and reach the same conclusions on a consistent basis." This observation is reflected in Dr. Agarwal's testimony indicating that he reviewed the laboratory testing performed by others, that he did not perform any fatigue testing, and that his review led him to believe that the shearing of the green blade resulted from fatigue rather than from overload as with the other blades. His testimony does not reflect how he arrived at this determination. Thus, the trial court was not manifestly erroneous in its rejection of this testimony.

Neither did other evidence dictate a finding that the crash was attributable to the manufacturer. The plaintiff points to the testimony of Mr. Kramer and the deposition testimony of eyewitness John Ross regarding the orange flash and sudden movement prior to the crash as proof that the pendulum weight mount separated during flight rather than from the impact. However, these statements merely establish the occurrence of the flash, the sudden movement, and the ultimate crash. It was the plaintiff's duty to relate these occurrences to the causation of the crash due to the in-flight separation of the pendulum weight mount. The trial court could have permissibly found that the plaintiff failed to satisfy this burden.[3]

_____

[3] In this regard, the trial court remarked:

10

The plaintiff's failure to prove its theory of in-flight separation, alone, satisfied the requirements for an involuntary dismissal. Further, the factual background of the crash indicates that the flight was undertaken at night in a helicopter unequipped for flight under instrument flight rules at a time when a flight by visual flight rules was not recommended. The nighttime flight occurred at a low altitude in the area of rolling terrain. Mr. Kramer testified that they were flying at an altitude of approximately 500 feet, while Mr. Ross additionally explained that the helicopter was flying just above tree level. Finally, a portion of the NTSB report indicated that radar from Fort Polk evidenced an altitude of approximately 200 feet prior to the crash.

In light of the trial court's rejection of Dr. Agarwal's expert testimony and the absence of other evidence indicating causation of the accident by an unreasonably dangerous condition pursuant to La.R.S. 9:2800.55 and La.R.S. 9:2800.56, we find no manifest error in the involuntary dismissal. By the above discussion, we further find no merit in the plaintiff's related assignment of error regarding proof of an in-flight breakup of the helicopter.

*Res Ipsa Loquitur*

The plaintiff also asserts the trial court erred in failing to apply the doctrine of *res ipsa loquitur* in its consideration of the evidence. The plaintiff argues that her evidence was uncontroverted and, therefore, the trial court must have found that the crash occurred due to an in-flight separation of the weight mount part. She asserts

---

The court is unable to determine the cause of the in-flight orange flash or the cause and extent of damage to the BO-105 that occurred at the time of the orange flash. It is possible that this pilot flew his craft into increasingly unsafe conditions and found himself dangerously close to the earth and made a controlled hard landing once he realized he was out of other options. It is also possible that something happened above the cabin that put the main rotor into an extreme out of balance condition while in flight and that condition impeded the pilot's capacity to control the craft. However the plaintiff bears the burden of proof and has not proven the case by a preponderance of the evidence.

11

that her case in chief was devoid of evidence to the contrary. Given this uncontradicted proof of in-flight separation, the plaintiff contends, negligence by ECD should have been presumed.

*Res ipsa loquitur* is a "a rule of circumstantial evidence which allows an inference of negligence on the part of the defendant if the facts indicate the defendant's negligence, more probably than not, caused the injury." *Linnear v. Centerpoint Energy Entex/Reliant Energy*, 06-3030, p. 12 (La. 9/5/07), 966 So.2d 36, 45. The three criteria for the application of the doctrine are as follows:

> (1) the injury is of the kind which does not ordinarily occur in the absence of negligence on someone's part; (2) the evidence sufficiently eliminates other more probable causes of the injury, such as the conduct of the plaintiff or of a third person; and (3) the alleged negligence of the defendant must be within the scope of the defendant's duty to the plaintiff.

*Id.* at 44.

The trial court observed two problems with the plaintiff's *res ipsa loquitur* argument, stating that:

> First the plaintiff has not proven that any part separated from this BO-105 while in-flight. Second the alternative explanation of the cause of this tragedy is as plausible as the explanation presented by the plaintiff. Under these circumstances the court finds the doctrine of *res ipsa loquitur* is inapplicable to this case and the burden is not shifted to the defendant.

The record supports this view. As explained above, the plaintiff argues that its evidence unequivocally establishes the in-flight separation of the pendulum weight mount. The evidence did not, however, require such a finding. Further, the plaintiff's argument fails due to the incorrect assertion that her evidence was uncontroverted. Rather, the trial court found no favor in the evidence presented by the plaintiff. While the trial court could, arguably, have accepted the testimony and evidence

12

presented, it rejected the plaintiff's view and did not draw the conclusions urged by the plaintiff.

Again, testimony was elicited from experts regarding the location of the wreckage and calculations regarding the altitude at which the separation could have occurred. The witnesses were rigorously cross examined and their testimony, including opinion testimony, was not so persuasive as to require the trial court's acceptance, particularly given the variables present regarding altitude, speed, and distance. With regard to the second element of *res ipsa loquitur*, the circumstances surrounding the crash suggested the possibility of other causes of the crash. The flight was at night, was conducted at an altitude that may have been as low as the tree tops, and in an area with rolling terrain. The defendant also elicited testimony from the plaintiff's expert in piloting helicopters and helicopter accident reconstruction regarding spatial disorientation, which, he explained, can prevent a pilot from recognizing that the craft is descending rather than ascending. In light of these factors, the trial court's determination as to the inapplicability of *res ipsa loquitur* is supported by the record.

This assignment lacks merit.

*Exclusion of Witnesses*

Trial in this case commenced in July 2006, but was not completed within the time allotted on the court's calendar. Thus, at the urging of the plaintiff, the trial court recessed the trial. Prior to the recess, the trial court explained that discovery was closed. It asked the parties to name the witnesses they would call when the trial resumed. When the trial resumed in February 2007, the plaintiff attempted to call three witnesses listed on its pre-trial witness list, but who were not named by counsel

13

at the close of the proceedings in July. The trial court excluded these witnesses, stating that it had intended that the witnesses named in court were to the exclusion of all others.[4] The plaintiff questions the exclusion of its witnesses, two eyewitnesses to the crash and an expert witness, and argues that the trial court did not specifically order that it could not call witnesses not named at the close of the first segment of the trial.

Louisiana Code of Civil Procedure Article 1631(A) instructs that a trial court "has the power to require that the proceedings shall be conducted with dignity and in an orderly and expeditious manner, and to control the proceedings at the trial, so that justice is done." Only upon a showing of a gross abuse of the discretion afforded a trial court by Article 1631 does an appellate court disturb a trial court's manner of conducting the proceedings. *Reider v. State ex rel. La. Bd. of Trustees*, 04-1403 (La.App. 3 Cir. 3/9/05), 897 So.2d 893, *writ denied*, 05-0938 (La. 5/20/05), 902 So.2d 1056.

---

[4] In excluding the three witnesses the plaintiff attempted to call, the trial court stated:

Well, this is a little disturbing. One would think that the testimony of eyewitnesses would be very relevant to the resolution of a dispute, and I have no idea why the testimony of these eyewitnesses were not taken during pretrial discovery and therefore preserved or for presentation in deposition form, all the questions you wanted to ask at that time. It's clear to me that my intent in getting the parties to disclose their - - the remaining witnesses prior to our breaking last time was so that everybody could look at what they have already - - that they believed they have proven, what they believe they need to prove, and then tell us what additional testimony we would be seeing so that both sides would be prepared to respond to the anticipated testimony of those particular witnesses and not spend time preparing for potential testimony from unnamed witnesses.

Mr. Jobe [ counsel for the plaintiff], if you did not understand from me to communicate that this was an exclusive list I don't know how I could have made that point. In that regard, I will not allow the testimony of Mr. Ross, Mr. Zumwalt, Mr. Saludo.

The transcript reveals that the parties were asked to designate the witnesses to be called when trial reconvened. Counsel for the plaintiff responded to the trial court's inquiry: "We would call, at the next trial date, Janice McLaud, followed by Marsha Gardner and/or Carolyn and Joe Stegman. And that would be the remainder of our witnesses, Your Honor." Defense counsel also listed the witnesses it might call and the deposition it might enter. These actions are consistent with the trial court's observation that it intended for the parties' designations to be exclusive, even of the pre-trial order. We find no abuse of discretion in this ruling and also note that the deposition of one of the eyewitnesses the plaintiff sought to call, Mr. Ross, was entered into evidence by the plaintiff earlier in the proceedings.

This assignment lacks merit.

*Remaining Assignments of Error*

As the remainder of the plaintiff's assignments of error address her concerns in the event a de novo review of the record is required due to a reversal of the involuntary dismissal, they are rendered moot by our affirmation of the dismissal.

**DECREE**

For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this proceeding are assessed to the plaintiff, Janice McLaud.

**AFFIRMED.**

15

KENT LOUIS KRAMER, JR., ET AL.

VERSUS

PETROLEUM HELICOPTERS, INC., ET AL.

**SAUNDERS, J., dissents and assigns written reasons.**

I respectfully disagree with the majority's opinion that the trial court did not commit manifest error in granting ECD's motion for involuntary dismissal. Louisiana Code of Civil Procedure article 1672(B) states:

> In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.

While it is true that when a court considers a motion for involuntary dismissal that a plaintiff is not entitled to any inferences in its favor, "absent circumstances in the record casting suspicion on the reliability of the testimony and sound reasons for its rejection, uncontroverted evidence should be taken as true to establish a fact for which it is offered." *Jackson v. Capitol City Family Health Ctr.*, 04-2671, p.4 (La.App 1 Cir. 12/22/05), 928 So. 2d. 129, 131.

The trial court granted ECD's motion for voluntary dismissal based largely on part to its decision to strip plaintiffs' witness, Dr. Agarwal, of his status as an expert in mechanical engineering, specifically in the area of composite failure analysis. The

majority opinion finds no manifest error in the trial court's decision regarding the unclear nature of the methodology underlying Dr. Agarwal's consideration and examination of the blade materials.

I disagree. I think that the only reasonable conclusion from a reading of the record is that Dr. Agarwal was clearly an expert in that field and to disregard his testimony as such was a mistake that led to the erroneous decision of the trial court to grant ECD's motion.

Our Louisiana supreme court, in *Cheairs v. State, Department of Transportation and Development, et.al*, 03-680, p.9 (La.12/3/03), 861 So.2d 536, 542, stated the following:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

[*City of Tuscaloosa v. Harcos Chemicals, Inc.,* 158 F.3d 548, 562 (11th Cir.1998)]

It is clear from the record that the first prong of the *Cheairs* test was met as the trial court stated that Dr. Agarwal was qualified, and the defendants conceded this point. Likewise, the third prong of the test was clearly met as the trial court stated in its reasons for judgment that he had qualified Dr. Agarwal as an expert because the court felt that he would provide it with the advantage of authentic insights and innovations from his expertise.

It is with Dr. Agarwal's methodology, the second prong of the test, that the trial court based its decision to disregard the expert's testimony. As to this prong of the test, our Louisiana supreme court has recognized that the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993)

are controlling. In *Cheairs*, 861 So.2d at 541, our Louisiana supreme court stated the following:

> *Daubert* established the following non-exclusive factors to be considered by district courts to determine the admissibility of expert testimony:
>
> (1) The "testability" of the scientific theory or technique;
>
> (2) Whether the theory or technique has been subjected to peer review and publication;
>
> (3) The known or potential rate of error; and
>
> (4) Whether the methodology is generally accepted in the scientific community.

I find that the record reveals that Dr. Agarwal's methodology satisfies the *Daubert* factors. His theory on fatigue failure has been tested and subjected to peer review in the United States, India, and the United Kingdom prior to being published in research journals and in Dr. Agarwal's own textbook. Dr. Agarwal's methodology was been accepted widely in the engineering community and his textbook is used to teach engineering students. Thus, I feel its passes *Daubert* muster.

Accordingly, I feel that the trial court was in error in disregarding Dr. Agarwal's testimony as an expert. Moreover, I feel that the plaintiffs have carried their burden to show a right of relief given Dr. Agarwal's testimony in light of the evidence given by Mr. Kramer and Mr. Ross that establish that the helicopter gave off an orange flash then made a sudden, violent movement just prior to crashing. As such, this court should conduct a de novo review of the record to make further findings in regards to the case should we find the record to be complete. Otherwise, it should remand the case for further proceedings not inconsistent with this court's opinion.