# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 13-668

**ROBERT DUNCAN, ET AL.**

**VERSUS**

**MORENO ENERGY, INC., ET AL.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 107506-A
HONORABLE PAUL JOSEPH DEMAHY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## MARC T. AMY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and J. David Painter, Judges.

**AFFIRMED.**

**Edward P. Landry**
**Landry Watkins Repaske & Breaux**
**Post Office Drawer 12040**
**New Iberia, LA  70562-2040**
**(337) 364-7626**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Robert Duncan**

**Randy P. Angelle**
**Boyer, Hebert, Abels & Angelle**
**401 E. Mills Avenue**
**Breaux Bridge, LA  70517**
**(337) 332-0616**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **William Rucks, IV**
    **Ray Flores**

**Donald L. Beckner**
**5800 One Perkins Place, Building 7, Suite A**
**Baton Rouge, LA   70808**
**(225) 769-7779**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Robert Duncan**

**Claude F. Reynaud, Jr.**
**Breazeale, Sachse & Wilson, L.L.P.**
**Post Office Box 3197**
**Baton Rouge, LA   70821-3197**
**(225) 387-4000**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Moreno Energy, Inc.**

**David M. Thorguson**
**Bourgeois Thorguson, L.L.C.**
**Post Office Box 3006**
**Morgan City, LA   70381**
**(504) 384-1833**
**COUNSEL FOR DEFENDANTS/APPELLEE:**
     **Carolyn Blanchard**
     **Michel B. Moreno**

**Mark J. Mansfield**
**Dutel & Tranchina, LLC**
**321 E. Kirkland St.**
**Covington, LA 70433**
**(985) 892-6474**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **Charles Hodges**

**AMY, Judge.**

The plaintiff, a minority shareholder in a corporation, alleges that the majority shareholder, and others, breached fiduciary duties he alleges were owed to him as a shareholder. In particular, he contends that those actions resulted in the devaluation of his initial ownership interest in the corporation. The plaintiff additionally advanced causes of action in fraud and breach of contract. Following a bench trial, the trial court granted motions for involuntary dismissal in favor of the defendants. The plaintiff appeals. For the following reasons, we affirm.

## Factual and Procedural Background

This matter involves a series of corporate actions involving three distinct corporate entities. The plaintiff, Robert Duncan, was initially the majority shareholder in 3-D Directional Drilling, Inc. Charlie Hodges and Michel[1] Moreno were also significant shareholders in the corporation.

In late 1997 and early 1998, Mr. Moreno sought to merge his company Moreno & Associates, Inc., along with 3-D Directional Drilling and Dynamic Industries, Inc., into one entity, Moreno Energy Services, Inc. (MES). MES distributed stock reflective of each shareholder's contribution to the newly formed corporation, whether through ownership interest in one of the predecessor companies, or by capital contribution. As pertinent to this matter, MES issued 875,000 shares of common stock to Mr. Moreno and 50,000 shares to Williams Rucks, IV (in exchange for a capital contribution). MES further issued Series B Preferred Stock, assigning that stock a $100 par value. Mr. Duncan received 18,000 shares of the Series B Preferred Stock and Mr. Hodges received 6,000

---

[1] Mr. Moreno's name is referred to as both "Michel" and "Michael" in the record. We adopt the former usage as reflected in the corporate documentation and counsel's brief to this court.

shares of that stock. Ray Flores, a shareholder in the predecessor company, Moreno & Associates, Inc., also received Series B Preferred Stock, as did others.

As a component of the merger, Mr. Duncan and Mr. Hodges executed employment agreements with MES to continue in their work functions in its directional drilling division. The employment agreements included salary provisions as well as non-competition provisions.

Following the 1998 merger, Mr. Moreno served as the Chief Executive Officer and President of the newly formed MES. He further performed the day-to-day operations of the corporation and, per the terms of his employment agreement, was "responsible for the development and execution of short-term and long-term plans and goals in all functional areas of the Company[,]" among other duties. The employment agreement further required that his actions were "reviewable by requisite action of the Board and shareholders of the Company in accordance with the Articles of Incorporation, the By-Laws of the Company, and applicable law[.]"

Testimony and documentary evidence indicate that, following the roll-up merger, MES faced financial difficulties during the subsequent two-year period, including those faced by the 3-D Directional Drilling division. In attempting to relieve MES of the liabilities associated with 3-D Directional Drilling, negotiations commenced for the assets and liabilities of that division to be carved from the company and sold to 3-D Acquisition Company, LLC. In pursuit of that transaction, both Mr. Duncan and Mr. Hodges signed a September 1999 agreement whereby they were released from non-competition agreements cited above. In return, Mr. Duncan and Mr. Hodges agreed for MES to have the right to convert their shares of Series B Preferred Stock into MES common stock. As seen below,

2

the question of whether MES abided by the terms of that agreement, with regard to conversion, is at issue herein.

In October 1999, as reflected in an Asset Purchase Agreement entered into evidence, the operations of the former 3-D Directional Drilling were terminated and all assets sold to 3-D Acquisition. A contemporaneously confected Amendment to Employment and Stock Purchase Agreement terminated Mr. Duncan's and Mr. Hodges' employment with MES so that the two could begin employment with 3-D Acquisition. The amended agreement formally terminated the non-competition agreement, as well as other restrictions. After that point, neither Mr. Duncan nor Mr. Hodges performed further services for MES. Both, however, retained their shares of Series B Preferred Stock in the company.

Testimony reflects that MES continued in financial difficulty through the subsequent period and was unable to meet certain obligations with its lenders. Mr. Moreno testified that he did not draw a salary for several years. However, the Directors of MES issued stock bonuses to Mr. Moreno on four occasions (August 31, 2001, August 31, 2002, January 31, 2004, and August 18, 2004) to reflect his ongoing efforts to reduce MES's indebtedness and turn it toward profitability.

The record reveals that MES took certain steps to convert Mr. Duncan's and Mr. Hodges' Series B Preferred Stock to MES common stock. By August 2001 letter, MES counsel informed the former shareholders of the ongoing financial difficulties and management's desire to have the MES balance sheet "cleaned up" in order keep the company viable and attractive to investors. The letter explained that Mr. Moreno would like "to retire the Series B Preferred Stock ($100 par value)

in MES[.]"[2]  The letter requested that the men submit an offer to sell their shares to MES.  Both men testified that they did not respond to the letter's requests.

In November 2001, Mr. Moreno again requested by letter that Mr. Duncan and Mr. Hodges sell their stock to MES.  He opined that the stock was "worth little, if anything" and that it could "remain on the books forever without any payments unless there is a public offering, which, as you are aware, is highly unlikely in the foreseeable future."  However, Mr. Moreno requested to purchase the stock in order to simplify the MES balance sheet, making the business more attractive for potential investors.  Mr. Moreno proposed to buy Mr. Duncan's

---

[2] The August 21, 2001 letter explained, in part that:

Currently, MES is in default of its loan agreement with Bank One, and has been in default for some time.  MES's president, Mike Moreno, has been working diligently to renegotiate the financial obligations of MES and to attract an investor into the company.  There is no guarantee that the bank will continue to work with the company.  Indeed, the bank only recently, and reluctantly, agreed to a 30-day extension of the line of credit facility.  Also, there is no guarantee that an infusion of capital from an investor will be made.

In order to keep MES viable and to position MES to have an investor make a capital infusion, Mr. Moreno would like to try to get the balance sheet cleaned up.  To that end, he would like to retire the Series B Preferred Stock ($100 par value) in MES, of which you currently are record owner of 6,000 shares.  This letter follows up on the conversation you had with Mr. Moreno, in which it was discussed that you make an offer to sell your Series B Preferred Stock.  We would like to receive your offer as soon as possible, preferably by the end of this week.

Management is considering different options on how to treat the Series B Preferred Stock in any reorganization or restructuring involving a new investor.  The first option is simply to leave the Series B Preferred Stock outstanding indefinitely, since it does not mature or carry a dividend.  Under its current capital structure, the company has the ability to issue $10 million of Series A Preferred Stock that would be senior to Series B Preferred Stock, and would have such terms and conditions as set by the Board of Directors.  Another option would be to convert all or a portion of your Series B Preferred Stock to common stock.  This would result in you receiving the number of common shares equal to the par value of the aggregate number of shares of Series B Preferred Stock divided by $30.  A third option is simply to purchase the Series B Preferred Stock at a mutually agreed upon price.

At any rate, management needs to reach a decision soon on exactly what, if anything, to do with the Series B Preferred Stock.  The preference is to clean up the balance sheet by buying up the Series B Preferred Stock.  This option would have certain advantages to all of the parties.  We would like to work with you to accomplish this objective.

4

18,000 shares for $20,000 and to forgive his "verbal commitment to reimburse the $40,000" that Mr. Moreno had "originally invested in 3-D[.]" Mr. Moreno proposed to purchase Mr. Hodges' 6,000 shares for $20,000. He further noted that, if they rejected the offer, MES's primary lender asked all shareholders to complete financial statements. Again, neither Mr. Duncan nor Mr. Hodges complied with Mr. Moreno's requests.

Subsequently, in December 2003, MES amended its Articles of Incorporation to allow for, among other things, conversion of Series B Preferred Stock to common stock. MES notified Mr. Duncan and Mr. Hodges of its intent to exercise its right to convert their respective shares into common stock. Thereafter, both Mr. Duncan and Mr. Hodges signed an "Agreement to Accept Common Shares in Exchange for Series B Preferred Shares" dated January 5, 2004. By that agreement, Mr. Duncan "agree[d] to accept 60,000 shares of common stock of [MES] in exchange for the 18,000 shares of Series B Preferred Stock" held by him. Mr. Hodges accepted 20,000 shares of MES common stock in exchange for his 6,000 shares of Series B Preferred Stock.

Ultimately, in July 2005, and pursuant to the short form merger provisions of La.R.S. 12:112(G), MES merged into a newly formed corporation, Moreno Energy Services, Inc. (MEI). By resolution, the MEI board of directors approved the merger of MES into MEI and the cessation of MES. That resolution set forth certain terms and provisions, including the cancellation of the common stock of MES and the determination that "shareholder common stock in MES (other than the Corporation) shall be paid cash consideration of seventy cents ($.70) for each share of common stock held[.]" Mr. Duncan and Mr. Hodges were thereafter

5

offered compensation of $42,000 and $14,000, respectively, for their MES stock. They were excluded from further shareholder status in MEI.

Mr. Duncan and Mr. Hodges instituted this matter by a 2006 petition alleging, among other things, breach of fiduciary duty, breach of contract, and fraud. The petition also sought to set aside the short-form merger of MES and MEI. MEI, Mr. Moreno (as a director and shareholder of MEI), and Carolyn Blanchard (as a director and shareholder of MEI) were named as defendants in that initial petition. The matter evolved during the subsequent years, with certain claims dismissed and various defendants named and, in some instances, dismissed.[3] In large part, however, the plaintiffs consistently alleged that various actions/inaction by the defendants damaged the value of their ownership interest in MES. The plaintiffs have largely contended that their interest should have been valued at par value for their respective ownership of Series B Preferred Stock in MES rather than the figure tendered for their common stock in MES.

The trial court considered the merits of the remaining claims in May 2012. At that time, Mr. Duncan and Mr. Hodges advanced breach of contract, breach of fiduciary duty, and fraud claims against MEI (as successor to MES), Mr. Moreno, and Ms. Blanchard. Additionally, the plaintiffs named Williams Rucks, IV, (an

---

[3] Included in this matter's procedural history are two decisions by this court. In *Duncan v. Moreno Energy, Inc.*, 08-786 (La.App. 3 Cir. 12/23/08), 1 So.3d 778, *writ denied*, 09-0470 (La. 4/17/09), 6 So.3d 793, a panel of this court concluded that the plaintiffs failed to comply with the dictates of La.R.S. 12:131 and, therefore, could not attempt to invalidate the merger between MES and MEI. Neither could the plaintiffs contest the value assigned to their MES stocks. However, the panel explained the ruling did not have a "bearing on Plaintiffs' claims for monetary damages from Defendants via breach of fiduciary duties or fraud." *Id.* at 788.

Subsequently, in *Duncan v. Moreno Energy, Inc.*, 09-1033 (La.App. 3 Cir. 3/10/10), 32 So.3d 1099, *writ denied*, 09-1033 (La. 6/4/10), 38 So.3d 308, this court reviewed the trial court's determination, on motion for summary judgment, that the plaintiffs' damages, if any, for the alleged loss of value of their stock would be measured before the merger of MES into MEI. That determination was affirmed. *Id.*

MES director, shareholder, and signatory to a Shareholders' Agreement), and, Ray Flores, (an MES shareholder and signatory to a Shareholders' Agreement) as defendants. During the course of the multiple-day trial, Mr. Hodges settled and dismissed his claim against all defendants. Mr. Duncan continued in the proceeding. Ultimately, the trial court granted the defendants' motions for involuntary dismissal pursuant to La.Code Civ.P. art. 1672(B).[4]

Mr. Duncan appeals, presenting the following issues for review:

1. Did the Trial Court make errors of law when it ruled that the burden of proof is on the plaintiff, who is owed a fiduciary duty, to prove that defendant, who owed the fiduciary duty, breached that duty?

2. Did any of the acts committed by Moreno and/or Rucks, IV set out herein constitute a breach of the fiduciary duty Moreno and/or Rucks IV owed to Duncan?

3. Did the acts of Moreno and MES breach the contract between the parties and Duncan?

4. Did acts of Moreno constitute fraud pursuant to Civil Code Article 1953?

## Discussion

*Breach of Fiduciary Duty*

Central to Mr. Duncan's claim is his contention that the defendants breached fiduciary duties owed to him as an MES shareholder. In particular, he questions actions taken after MES's 1999 sale of the assets of 3-D Directional Drilling. Notably, he asserts that he was not provided with information regarding the MES

---

[4] Louisiana Code of Civil Procedure Article 1672 provides, in part:

B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.

7

stock bonuses awarded to Mr. Moreno. This lack of information, Mr. Duncan contends, led him to believe that, when he agreed to transfer his Series B Preferred Stock into common stock, he was doing so for like value. Yet, he suggests that he was left only with stock that had been devalued by the issuance of those stock bonuses. Mr. Duncan also questions the propriety of the issuance of the stock bonuses, themselves.

Entitled "Relation of directors and officers to corporation and shareholders," La.R.S. 12:91 provides the burden of proof applicable to a breach of fiduciary claim as follows:

> A. Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment, and skill which ordinary prudent men would exercise under similar circumstances in like positions; however, a director or officer shall not be held personally liable to the corporation or the shareholders thereof for monetary damages unless the director or officer acted in a grossly negligent manner as defined in Subsection B of this Section, or engaged in conduct which demonstrates a greater disregard of the duty of care than gross negligence, including but not limited to intentional tortious conduct or intentional breach of his duty of loyalty. Nothing herein contained shall derogate from any indemnification authorized by R.S. 12:83.

> B. As used in this Section, "gross negligence" shall be defined as a reckless disregard of or a carelessness amounting to indifference to the best interests of the corporation or the shareholders thereof.

> C. A director or officer who makes a business judgment in good faith fulfills the duty of diligence, care, judgment, and skill under Subsection A of this Section if the director or officer:

> (1) Does not have a conflict of interest with respect to the subject of the business judgment.

> (2) Is informed with respect to the subject of the business judgment to the extent the director or officer reasonably believes to be appropriate under the circumstances.

> (3) Rationally believes that the business judgment is in the best interests of the corporation and its shareholders.

D.   In fulfilling his duties under this Section, a director or officer is entitled to rely upon records and other materials and persons as specified in R.S. 12:92(E).

E.   A person alleging a breach of the duty of diligence, care, judgment, and skill owed by an officer or director under Subsection A shall have the burden of proving the alleged breach of duty, including the inapplicability of the provisions as to the fulfillment of the duty under Subsections C and D and, in a damage action, the burden of proving that the breach was the legal cause of damage suffered by the corporation.

F.   The provisions of this Section shall apply to all business organizations, whether incorporated or unincorporated, formed under Louisiana law.

Before granting the motion for involuntary dismissal on Mr. Duncan's breach of fiduciary duty claim, the trial court initially resolved Mr. Duncan's contention that the transaction at issue breached duties owed under the 1999 "Agreement" wherein Mr. Duncan (as well as Mr. Hodges) granted MES the prospective right to convert the Series B Preferred Stock into common stock. The trial court concluded that Mr. Duncan could not complain of the ultimate conversion of the stocks, thereunder, due to the February 2004 "Agreement to Accept Common Shares in Exchange for Series B Preferred Shares[.]" The court explained:

> [A]s I understand this argument, is that there was a violation of the agreement because the Plaintiffs claim that they were entitled to more shares, a greater number of shares, of common stock in Moreno Energy Services, Inc. I mean that [sic] are various reasons why it should be more; but when it was converted, the number of shares they received, based on the September 3, 1999 Agreement, they should have received more shares than they did receive – more common shares.

**By [counsel for Mr. Duncan]:**
    Yes, sir.

**By the Court:**
    Well, on February 2nd, 2004 Robert Duncan signed an agreement accepting the common shares in exchange for his Series B shares, acknowledging receipt of the shares evidencing such shares of

common stock and agreed to accept six thousand shares (6,000) shares of common stock in Moreno Energy [Services], Inc. in exchange for eighteen thousand (18,000) shares of Series B stock of the company held by him, the company being Moreno Services, Inc.

On April 23rd, 2004, Mr. Hodges signed an agreement and says that, by signing below, he agrees to accept twenty thousand (20,000) shares of common stock in Moreno Energy Services, Inc. in exchange for six thousand (6,000) shares of Series B preferred stock of the company.

So they accepted the exchange. They cannot now complain that they were shorted.

On appellate review, a trial court's ruling on a motion for involuntary dismissal is reviewed for manifest error. Having reviewed the record, we find no such error in the trial court's determination. *See Kramer v. Petroleum Helicopters, Inc.*, 08-133 (La.App. 3 Cir. 11/26/08), 999 So.2d 101, *writ denied*, 09-0402 (La. 5/1/09), 6 So.3d 811.

Rather, testimony established that, in 1999, the 3-D Directional Drilling division of MES was in a period of financial difficulty. Mr. Hodges confirmed at trial that Mr. Duncan informed him that MES would be closing 3-D Directional Drilling due to lack of profit. In order to enable the acquisition of 3-D Directional Drilling by 3-D Acquisition, the September 1999 "Agreement" entered into by MES, Mr. Duncan, and Mr. Hodges was completed. That Agreement, referenced by the trial court, released the two men from the non-competition agreements and further provided that:

Section 2. In exchange for granting a release of the noncompetition agreements that affect Duncan and Hodges, Duncan and Hodges agree that Moreno shall have the right, upon fifteen (15) days written notice to Duncan and Hodges, to require that any and all of Duncan's and Hodges' Series B Preferred Stock ($100 par value) in Moreno be converted into Moreno common stock. Upon conversion, Duncan and Hodges shall be entitled to receive the number of common shares equal to the par value of the aggregate number of shares of Series B Preferred Stock to be converted, divided by thirty

($30) dollars (the "Conversion Rate"). The Conversion Rate shall be automatically adjusted, from time to time, to take into effect any stock split, stock dividend or other type of dividend (a "Conversion Adjustment Event") paid on or distributed with respect to the Moreno common stock such that, upon conversion, Hodges and Duncan would receive that number of shares or other property that they would have received if their conversion had occurred immediately prior to any Conversion Adjustment Event(s). When required for a complete conversion of the Series B Preferred Stock, Moreno shall issue fractional shares, script or other certificates evidencing such fractional shares, calculated to the nearest one-tenth (1/10) of a share; provided, however, that fractional shares shall have no voting rights.

Unquestionably, Mr. Duncan acquiesced in the conversion of his Series B Preferred Stock to common stock and, in exchange, received a release from the non-competition agreement. He explained that he then began working for 3-D Acquisition. However, as he did at trial, Mr. Duncan asserts that the defendants breached a fiduciary duty when they failed to adequately compensate him for his Series B Preferred Stock per Section 2 of the 1999 Agreement.

Yet, and as recognized by the trial court, Mr. Duncan, in 2004, entered into an "Agreement to Accept Common Shares in Exchange for Series B Preferred Shares." That agreement plainly provided that:

> By signing below, Robert H. Duncan (the "Shareholder") agrees to accept 60,000 shares of common stock of Moreno Energy Services, Inc. (the "Company") in exchange for the 18,000 shares of Series B Preferred Stock of the Company held by him, acknowledges receipt of the common stock certificate No. 16 evidencing such shares of common stock, and agrees to promptly return or destroy the 18,000 shares of Series B Preferred Stock of the Company to be held by him, which in any event as of January 5, 2004 shall be cancelled and deemed no longer outstanding.

As the trial court observed, Mr. Duncan accepted that exchange and may not now contest that conversion. Rather, an offer was made for a distinct number of common shares and he accepted that offer. He did so without an apparent contest in accepting that conversion rate. While Mr. Duncan claims that he was wrongly

11

led to believe that he was trading his Series B Preferred Stock for "like value" common stock, he has not pointed to a specific obligation, whether by governing corporate articles or by agreement, to provide him with the financial details of MES he claims were due. A large part of the financial information Mr. Duncan claims he was entitled to pertains to the MES Board's issuance of stock bonuses to Mr. Moreno, the propriety of which is discussed below. Again, however, Mr. Duncan does not refer to any particular obligation owed to him to disclose those bonuses prior to his acceptance of a defined number of common stock shares. In short, the record reveals no evidence indicating that the trial court erred in dismissing the breach of fiduciary duty claim on the basis that he was misled into accepting lesser valued stock.

In a related argument, and one that pertains to the fraud argument below, Mr. Duncan questions the MES Board's motivation in issuing the stock bonuses to Mr. Moreno. Mr. Duncan notes in brief that Mr. Moreno's Service and Employment Agreement sets forth certain duties required of Mr. Moreno in exchange for the compensation described therein. Mr. Duncan asserts that the justification for the stock bonuses included duties required of Mr. Moreno by that agreement as a foundational matter and, thus, no valid basis for the bonus existed.

In rejecting Mr. Duncan's argument in this regard, the trial court focused on the stock bonuses of January 31, 2004 and August 18, 2004, stating:

> According to the Minutes of the Board and the testimony of the Board members, they testified those bonuses were granted . . . because of exceptional work of Mr. Moreno. Nobody could testify why they picked that number or why they picked the value that they put on that number of shares; but they all testified he had done exceptional work during that period.
>
> There has been no evidence as to what the value of that work was, no evidence of how they came up with the numbers to award.

12

It is also noted at the time they were awarded, the Plaintiffs were common shareholders and had already given up their right to place a member on the Board as preferred shareholders. So the Board was authorized to grant the bonuses.

A common shareholder is not entitled to notice of Board Meetings. They are entitled to information regarding the financials of the corporation and what goes on in Board Meetings if they request it. They never requested that information. They were, at that point, not entitled to Notice of Board Meetings.

There is no evidence that this action was taken specifically for the purpose of diluting the interest of other shareholders. All the evidence is that the Board wished to reward Mr. Moreno for a job well-done, but did not have the cash to do so; so they gave him stock.

The evidence was also that all his efforts were to keep the corporation going in hard times. The last few years things were getting better and he was rewarded for that. There is no evidence that it was done to harm the position of the minority shareholders. It had some effect on their position in the corporation, but there is not evidence that that was the intention of the Board in doing that.

Again, the trial court's ruling is supported by the record. Testimony indicated that MES struggled financially for a multi-year period after its formation. In fact, Mr. Moreno testified that he did not receive a salary for a period of three years, but that he continued to work in an effort to make the company lucrative. He and Board members testified at length regarding efforts to improve MES's position with its creditors during that difficult period.

Additionally, and although Mr. Moreno's job description was expansive, each of the MES Board's decisions to issue the stock bonuses recognized that the compensation was provided for particularized efforts. For example, the January 31, 2004 bonus, evidenced by an "Action by Unanimous Written Consent of the Directors in Lieu of Meeting of Moreno Energy Services, Inc." set forth a resolution that:

1,900,000 shares of common stock of Moreno Energy Services, Inc., having a value of $9,500.00, be issued to Michel B. Moreno for his

efforts in completing the acquisition of the Construction Division assets of Production Management Industries, L.L.C., from Superior Energy Services, the value of which exceeds the value of the stock being issued; and that the proper officers of this corporation are authorized and directed to issue a certificate of stock of this corporation evidencing this action upon obtaining any consents required by any contract, loan agreement, shareholder agreement or other obligation of this corporation.

Similarly, the minutes of the August 18, 2004 MES Board of Directors meeting included a resolution that: "1,900,000 shares of common stock be issued to Michel B. Moreno as a result of his work in acquiring the assets of Advanced Offshore Services, the value of which exceeds the value of the stock being issued[.]"

Given the evidence of the Board's recognition of Mr. Moreno's service during a period of financial difficulty, we find no manifest error in the trial court's rejection of the contention that there was no basis for the stock bonuses. Instead, the record supports the trial court's finding that the Board sought to reward Mr. Moreno during a period of poor cash flow.

*Burden of Proof – Breach of Fiduciary Duty*

With regard to the breach of fiduciary duty claim, Mr. Duncan asserts that the trial court erred in requiring him to satisfy the burden of proof enunciated in La.R.S. 12:91(E) on certain breach of fiduciary duty claims involving transactions in which Mr. Moreno received a benefit, e.g., MES stock. Rather, citing *Noe v. Roussel*, 310 So.2d 806 (La.1975), Mr. Duncan contends that the defendants were required to prove that Mr. Moreno acquired those assets in good faith and that the transactions were entered into at arm's length. He suggests that the defendants did not establish good faith in light of the benefit received by Mr. Moreno to the detriment of the stock of the common shareholders.

14

Certainly, La.R.S. 12:91(E) places the burden of proof in a breach of fiduciary duty claim on the person seeking to establish that claim. Additionally, however, La.R.S. 12:84[5] sets forth certain standards by which an interested director may enter into a transaction beneficial to himself or herself. In this regard, a panel of this court has explained that "[a]n interested director bears the burden of proving his good faith in entering into the contract as well as the inherent fairness of the contract from the standpoint of the corporation. This requires the director to prove that the contract was essentially an arm's length transaction." *Church Point Wholesale Beverage Co., Inc. v. Voitier*, 97-650, p. 9 (La.App. 3 Cir. 1/14/98), 706 So.2d 1015, 1019-20 (citing *Noe*, 310 So.2d 806; *Woodstock Enter., Inc. v. Inter. Moorings & Marine, Inc.*, 524 So.2d 1313 (La.App. 3 Cir. 1988)), *writ denied*, 98-0379 (La. 4/9/98), 717 So.2d 1145.

---

[5] Louisiana Revised Statutes 12:84 provides that:

A. No contract or transaction between a corporation and one or more of its directors or officers, or between a corporation and any other business, nonprofit or foreign corporation, partnership, or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the common or interested director or officer was present at or participated in the meeting of the board or committee thereof which authorized the contract or transaction, or solely because his or their votes were counted for such purpose, if:

(1) The material facts as to his interest and as to the contract or transaction were disclosed or known to the board of directors or the committee, and the board or committee in good faith authorized the contract or transaction by a vote sufficient for such purpose without counting the vote of the interested director or directors; or

(2) The material facts as to his interest and as to the contract or transaction were disclosed or known to the shareholders entitled to vote thereon, and the contract or transaction was approved in good faith by vote of the shareholders; or

(3) The contract or transaction was fair as to the corporation as of the time it was authorized, approved or ratified by the board of directors, committee, or shareholders.

B. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorized the contract or transaction.

Recall that this case was dismissed at the close of Mr. Duncan's evidence. Even without the defendants' presentation of their own evidence, the trial court's ruling reflects its determinations that the transactions complained of by Mr. Duncan were justifiable and were not made with an intent to devalue Mr. Duncan's shareholder status in the company. As explained above, we find that the trial court's ruling in this regard is supported by the record.

The plaintiff's argument regarding breach of fiduciary duty lacks merit.

*Fraud*

Furthermore, and generally referencing the events and transactions discussed above, Mr. Duncan argues that the trial court erred in dismissing his claim for fraud.[6] However, as excerpted above, the trial court specifically determined that the defendants did not withhold notice to which Mr. Duncan was entitled nor did the defendants take any action for the specific purpose of devaluing Mr. Duncan's stock. Rather, the defendants acted within the confines of the notice requirements, as they pertained to Mr. Duncan, and without an intention to specifically devalue his position in the company. Those determinations are supported by the record.

*Breach of Contract*

Finally, Mr. Duncan also questions the trial court's dismissal of his breach of contract claim. In this regard, he claims that he was treated differently from other minority shareholders in the corporation and that this constituted a violation of the co-sale and drag along rights provisions of the 1998 Shareholders Agreement for MES. Section 6.1 of that Agreement provides that:

---

[6] Louisiana Civil Code Article 1953 defines fraud as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction."

16

> If any Common Shareholder proposes to transfer all or any portion of its Stock (for purposes of this section, a *Sale*) to a third party (for purposes of this section, a *Purchaser*), and the remaining Common Shareholders do not exercise their first refusal rights pursuant to Article 3, then all of the Common Shareholders, as the case may be, shall have the right, exercisable by written notice to the Corporation and the Purchaser as of the expiration of its first refusal period pursuant to Article 3 (the *Election Date*) to require the Purchaser to purchase, on a pro rata basis (assuming all Warrants of [First Commerce Capital, Inc.] have been exercised), Shares of the Common Shareholders or their transferees, as the case may be, for the same price and on the same terms and conditions as those of the Sale . . . .

Mr. Duncan argues that this provision required that "[w]hen MEI acquired Moreno's common stock in MES [at the time of the short form merger], MEI was required to purchase the common stock of MES held by Duncan."

However, in rejecting this claim, the trial court noted that the Shareholder Agreement provides, in a preceding paragraph, that:

> 3.1    No Securities in this Corporation shall be transferred, sold, assigned, pledged, encumbered, or in any manner alienated, unless the Securities shall first have been offered for sale to the Corporation, and if the Corporation elects not to purchase the Securities, then to each remaining Common Shareholder of the Corporation in proportion to such remaining Common Shareholder's stock ownership in the Corporation.    The Corporation or each remaining Common Shareholder shall have an option to purchase the stock to be transferred at the same price and on the same terms and conditions as the offeree shall have been offered by a third person at arm's–length, acting in good faith.

Further, Paragraph 3.3 states that:

> 3.3    For the purpose of this Article 3 the restrictions on transfer and the right of first refusal do not apply to a sale, assignment, gift, or exchange by a Shareholder to or with any person whose ownership of such shares of stock would be attributed to the selling Shareholder under § 318 of the Internal Revenue Code of 1954, as amended, or by any transfer of Warrants by FCC.

In this instance, the trial court noted that no rights of first refusal existed with regard to the transfer of Mr. Moreno's stock to MEI pursuant to Paragraph 3.1 and 3.3.    Rather, the transaction was a transfer of Mr. Moreno's stock into a

17

corporation that he owned, MEI, and was, thus, merely attributable to him for taxation purposes. Accordingly, Paragraph 6.1, relied upon by Mr. Duncan, is inapplicable. We find no error in that determination. Rather, the transaction complained of did not involve a third party so as to implicate Paragraphs 3 and 6 of the Shareholder Agreement.

This argument lacks merit.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this proceeding are assigned to the appellant, Robert Duncan.

**AFFIRMED.**