NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 17-704 consolidated with CA 17-705

ARC INDUSTRIES, L.L.C.

VERSUS

WILLIAM H. NUNGESSER

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20063028 C/W 20083100
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

CANDYCE G. PERRET
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Billy Howard Ezell, Van H. Kyzar, and Candyce G. Perret, Judges.

AFFIRMED.

**David Michael Hufft**
**George Pivach  II**
**Timothy Thriffiley**
**Pivach, Pivach, Hufft**
**P. O. Box 7125**
**Belle Chasse, LA 70037**
**(504) 394-1870**
**COUNSEL FOR APPELLANT:**
    **William H. Nungesser**

**Ian Alexander Macdonald**
**Jones Walker**
**P. O. Drawer 3408**
**Lafayette, LA 70502-3408**
**(337) 593-7600**
**COUNSEL FOR APPELLEES:**
    **Dynamic Industries, Inc. and**
    **LQT Industries, LLC**

**Jennifer M. Ardoin**
**Frank S. Slavich, III**
**Babineaux, Poche, Anthony & Slavich, L.L.C.**
**P. O. Box 52169**
**Lafayette, LA 70505-2169**
**(337) 984-2505**
**COUNSEL FOR APPELLEE:**
    **Michel B. Moreno**

**PERRET, Judge.**

Appellant, William Nungesser ("Mr. Nungesser," sometimes referred to as "Billy") appeals the trial court's judgment finding that no contract existed between himself and Appellees. Mr. Nungesser maintains that a valid agreement was entered into, and he thereafter began performing the work considered in the agreement, which performance he argues was accepted by Appellees. Although the trial court found no contract existed between the parties, the court did render judgment in favor of Mr. Nungesser for damages pursuant to the theory of unjust enrichment. Mr. Nungesser also seeks review of the amount of damages awarded pursuant to this theory. Additionally, on this issue, Appellees answered the appeal seeking review of the unjust enrichment finding, requesting that those damages be set aside. We agree with the trial court's judgment for the following reasons and now affirm.

## ISSUES FOR REVIEW

This court must decide:

1. Did the trial court commit manifest error in finding that there was no contract between Mr. Nungesser and Arc Industries, L.L.C. ("Arc")[1] for Mr. Nungesser's consulting services, and, if so, is Mr. Nungesser entitled to fifteen percent of Arc's gross revenues for a three-year period beginning in 2004?

2. Did the trial court commit manifest error in finding Michel Moreno is not personally liable for breach of a consulting agreement and thus err in granting Mr. Moreno's motion for involuntary dismissal?

3. Did the trial court err in finding Arc was unjustly enriched, and did it abuse its discretion in awarding $50,000.00 in damages to Mr. Nungesser under the theory of unjust enrichment?

---

[1] Arc Industries, L.L.C. is now LQT Industries, L.L.C. It was formally Arc Equipment Rentals, L.L.C. Arc was a subsidiary of Dynamic Industries, Inc. when the events leading to this lawsuit began.

4. Did the trial court abuse its discretion in failing to require Arc to produce documents pertaining to its customers and its revenues received from those customers so that Mr. Nungesser could quantify his damages under the theory of unjust enrichment?

5. Did the trial court abuse its discretion in refusing to allow Mr. Nungesser to introduce Nungesser Proffer #1, a document for purposes of settlement showing Arc's gross revenues?

## FACTUAL AND PROCEDURAL BACKGROUND

The events leading up to this case began in 2004 when Emile Dumesnil ("Mr. Dumesnil"), an investment banker, realized that two of his clients, Michel Moreno ("Mr. Moreno") and Mr. Nungesser, both expressed an interest in the portable offshore living quarters business. Consequently, Mr. Dumesnil arranged a lunch meeting in New Orleans between Mr. Moreno and Mr. Nungesser in 2004, around September, to discuss the possibility of creating a new company that would rent portable living quarters to the offshore industry. Mr. Moreno was affiliated with Arc Industries. At the time, neither Arc Industries nor its parent company, Dynamic Industries, Inc. ("Dynamic"), were involved in the portable living quarters business. On the other hand, Mr. Nungesser previously worked offshore for his father's offshore catering business and also created a company called General Marine, which was involved in the portable living quarters business.

At the meeting, both parties expressed an interest in the possibility of starting this business journey together. Therefore, Mr. Dumesnil prepared a Letter of Interest ("LOI"), which was signed by Mr. Nungesser and by Mr. Moreno, who signed on behalf of "Newco," in October 2004. The LOI states that it is a "non-binding framework to further the discussions towards a consulting arrangement between the parities [sic]." Importantly, the letter stated that, "should the parties come to a definitive agreement, they will enter into a binding arrangement at that

2

time." The LOI further detailed the business of the start-up company, potential names for the start-up company, compensation to Mr. Nungesser, the assignment of an employee, Michelle Citron, to assist Mr. Nungesser, the term of the agreement, and the potential equity participation. Specifically, the LOI detailed the following:

> Consulting Agreement: Billy Nungessor [sic] ("Consultant") will enter into a consulting agreement (the "Agreement") with a start up company that shall be engaged in the business of owning and leasing offshore living quarters.
>
> . . . .
>
> Compensation: Compensation will be paid within 15 days of month's end at rate of 15% of the prior month's gross revenue, less charge offs of receivables.
>
> . . . .
>
> Other Terms and Conditions:
> During the term of this Agreement, Newco (or affiliate) at its expense will support Consultant with the following:
> 1. Consultant's expenses will be reimbursed within 30 days of expense report filing, up to a maximum amount of $2,500 / month for travel and entertainment expensed, or such other amount as mutually agreed upon by the parties.
> 2. Dedication of Michele Citroen [sic] or comparable sales person.
> 3. Development of a Web site, brochures and other marketing material appropriate for equipment rental companies on the offshore oil and gas industry.
> 4. Full administrative support for billing, collecting, bookkeeping, inventory control and other necessary back office functions customary for equipment rental companies in the offshore oil and gas industry.
> 5. Consultant will be provided an office in the Harvey facility with appropriate support staff.

Accordingly, Mr. Nungesser and Mr. Moreno/Newco contemplated that they would enter into a separate, binding agreement if the business venture was created

and a definitive agreement was reached between the parties. Although there was never a signed consulting agreement, Mr. Nungesser began providing his expertise to Arc. Michelle Citron was assigned to assist Mr. Nungesser. Mr. Nungesser alleges he began making sales calls and visits to various potential clients, he taught Arc employees about the portable living quarters business and how to bid packages to potential customers, he met with Arc's engineering company to assist in the designs of the buildings, and he attended various meetings on the matter.

Approximately eight months went by before a consulting agreement was circulated by Mr. Nungesser's attorney. The draft agreement encompassed all terms of the LOI with some additions, such as extending the term. Although Mr. Dumesnil provided several changes, Mr. Moreno did not respond to the exchange. In fact, Mr. Moreno contends that he never saw the written consulting agreement proposed by Mr. Nungesser, the additions proposed by Mr. Dumesnil, or the version of the agreement incorporating some of Mr. Dumesnil's proposed changes that were sent to him in July of 2005. Despite follow-up requests from Mr. Nungesser's attorney to finalize an agreement, no consulting agreement was ever executed, and the entities described in the LOI and draft consulting agreement were never created. Nevertheless, Mr. Nungesser continued to provide consulting services to Arc.

On November 11, 2005, Stephanie McNeese, Arc's Controller, wrote Mr. Nungesser a check for reimbursement for January through July expenses and compensation for July through August. However, on January 23, 2006, Mr. Dumesnil advised Ms. McNeese, and copied Mr. Nungesser on the email, that no compensation amounts should be paid until the "deal" is squared away. Arc also contends this payment was in error.

4

Thereafter, Arc filed a petition for declaratory judgment seeking a declaration that Mr. Nungesser has no right to demand any commission payments or other consideration from Arc and requested the court order Mr. Nungesser to return all payments that Arc made to Mr. Nungesser. Mr. Nungesser objected to the venue of Arc's petition, but that exception was ultimately denied. Mr. Nungesser thereafter filed suit in Plaquemines Parish against Mr. Moreno, Mr. Dumesnil, and Dynamic seeking payment according to the LOI and demanding that he be allowed to buy into the company as provided for in the LOI. Mr. Nungesser also filed a reconventional demand to Arc's petition, seeking the same relief as requested in his Plaquemines Parish petition. Mr. Moreno, Mr. Dumesnil, and Dynamic intervened, uniting with Arc and becoming Defendants-in-Reconvention to Mr. Nungesser's Reconventional Demand.

Mr. Nungesser amended his Reconventional Demand in 2010, adding a claim for unjust enrichment. Additionally, Mr. Dumesnil filed an Exception of No Cause of Action in response to those claims against him in his individual capacity, which was granted and then affirmed by this court. The case eventually went to trial with the remaining parties.

At the trial on the merits, testimony was presented by Arc from Mr. Dumensil and Mr. Moreno, both asserting there was no contract with Mr. Nungesser. Mr. Dumesnil reiterated that the LOI simply documented the parties' conversations and permitted the parties to enter a phase of due diligence in which the possibility of this endeavor could be explored. On the other hand, Mr. Nungesser testified he believed he had a "handshake agreement" when he left the very first meeting, the New Orleans lunch meeting, with Mr. Moreno and Mr. Dumesnil. We note that he further acknowledged he never believed Mr. Moreno

was binding himself personally to an agreement. Additionally, Mr. Nungesser provided his testimony, as well as that of Kelly Nicotri and Michelle Citron, regarding the services and knowledge he provided for Arc, as well as that of Stephanie McNeese regarding Arc's check that was sent to Mr. Nungesser for expenses and fifteen percent of Arc's income for several months.

The trial court ultimately believed it clear to all parties that Mr. Moreno was never acting in his individual capacity and that he was always signing on behalf of a corporate entity. Accordingly, upon Mr. Moreno's motion, the trial court dismissed Mr. Moreno individually. A judgment to this effect was signed on March 7, 2017.

Arc then moved to dismiss Mr. Nungesser's Reconventional Demand arguing there was no agreement. The trial court took the matter under advisement and requested subsequent briefing. The trial court concluded that there was no agreement, oral or written. However, the court did find that Mr. Nungesser provided services to Arc, and that Arc was unjustly enriched by his services. Therefore, the court awarded Mr. Nungesser $50,000.00 plus interest and court costs against Arc and Dynamic. The judgment was signed on April 17, 2017. This appeal followed.

## LAW AND DISCUSSION

### Assignment of Error Number One—Written, Implied, or Oral Contract:

Assignment of Error Number One, as well as Number Two, hinges on whether there was an agreement between the parties, including Mr. Moreno in his individual capacity. On appeal, the manifest error—clearly wrong standard should be applied to factual findings: "The determination of the existence of a contract is a

6

finding of fact, not to be disturbed unless clearly wrong." *Dubois Const. Co. v. Moncla Const. Co. Inc.*, 39,794, p. 2 (La.App. 2 Cir. 6/29/05), 907 So.2d 855, 857.

> Where there is conflict in the testimony, reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel its own evaluations and inferences are equally reasonable. *Stobart v. State, Through DOTD,* 617 So.2d 880 (La.1993); *Harrison v. Gore,* 27,254 (La.App.2d Cir.8/23/95), 660 So.2d 563, *writ denied,* 95–2347 (La.12/8/95), 664 So.2d 426; *Gardner v. McDonald,* 27,303 (La.App.2d Cir.8/23/95), 660 So.2d 107, *writ denied,* 95–2349 (La.12/15/95), 664 So.2d 453. Likewise, reasonable evaluations of credibility should not be disturbed on review. *Marshall v. Caddo Parish School Board,* 32,373 (La.App.2d Cir.10/29/99), 743 So.2d 943. It is the factfinder's duty to weigh credibility and accept or reject all or part of a witness[2] testimony. *Id.* Furthermore, when findings of fact are based on determinations of credibility of witnesses, the manifest error-clearly wrong standard mandates great deference to the determinations made by the trial court. *West v. Williams,* 30,842 (La.App.2d Cir.8/19/98), 717 So.2d 1224**. If the trial court's findings are reasonable when the record is reviewed in its entirety, the appellate court may not reverse them**. *Fowler v. Wal–Mart Stores, Inc.,* 30,843 (La.App.2d Cir.8/19/98), 716 So.2d 511.

*O'Glee v. Whitlow*, 32,955, pp. 3-4 (La.App. 2 Cir. 4/7/00), 756 So.2d 1288, 1291 (emphasis added).

"A contract is formed by the consent of the parties established through offer and acceptance. Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent." La.Civ.Code art. 1927. Additionally, the party seeking to enforce an obligation has the burden of proving the existence of the obligation. La.Civ.Code art. 1831.

However, "when parties agree to reduce their contract to writing, the contract is not perfected, and there is no contract until the writing is duly

7

executed." *Boothe v. May*, 425 So.2d 313, 315 (La.App. 3 Cir. 1982), *writ denied*, 429 So.2d 146 (La.1983); *Brewer v. Loewer*, 383 So.2d 1325, 1329 (La.App. 3 Cir.), *writ denied*, 391 So.2d 456 (La.1980); *see also* La.Civ.Code art. 1947 and *Segura v. Louisiana Architects Selection Bd.*, 340 So.2d 369 (La.App. 1 Cir. 1976), *writ denied*, 342 So.2d 676 (La.1977).

> It is well settled that where parties intend to reduce their negotiations to writing, they are not bound until the contract is reduced to writing and signed by them. Even if all terms of the alleged contract have been verbally agreed upon, so long as it is a part of the bargain that the contract be reduced to writing, no valid contract exists until it is reduced to writing.

*Johnston v. Johnston*, 469 So.2d 31, 32 (La.App. 1 Cir. 1985).

The first circuit in *Segura* stated:

> [I]f the facts of the case reveal that the parties did not intend to be bound until the execution of a written document, no contract can exist until that event takes place. However, even when a written document is contemplated, if the parties intend to be bound by their original verbal agreement, then a contract subsists from that time, and the writing, if executed, is a memorial of that agreement.

*Segura*, 340 So.2d at 371.

The supreme court in *Breaux Bros. Construction Co. v. Associated Contractors, Inc.*, 77 So.2d 17, 20 (La.1954), explained the idea set forth in *Segura*, distinguishing those cases in which there is a complete verbal contract, from those in which it is "a part of the bargain that the contract shall be reduced to writing." Specifically:

> In the first class of cases the original verbal contract is in no manner impaired by the failure to carry out the subsequent agreement to put it in writing. *In the second class of cases, the final consent is suspended; the contract is inchoate, incomplete, and it can not be enforced until it is signed by all the parties.*

*Id.* In *Breaux*, all parties acknowledged that a written agreement was necessary. The parties, Breaux and Associated Contractors, Inc., contemplated entering a subcontract for construction work. The parties met twice to discuss the work and the price. Breaux believed that by the end of the second meeting there was an oral contract—that the parties had agreed on the work and the price. Associated Contractors, however, denied there was an oral agreement, denied the price was agreed upon at the second meeting, and insisted the parties intended, from the beginning, that any agreement reached would be reduced to writing and signed by all parties. The supreme court concluded:

> [E]ven if all of the terms of the alleged contract between plaintiff and defendant had been verbally agreed upon, no valid contract would have existed between the parties because this case falls within the second class of cases . . . and therefore in this case the final consent of the parties was suspended until such time as the contract should be reduced to writing and signed by all the parties.

*Id.*

In the case before this court, all parties testified that a final written consulting agreement was never resolved and never executed. Therefore, the only written, signed document involved in this case was the LOI. Even Mr. Nungesser acknowledged the LOI was a non-binding agreement. Based on the testimony and evidence presented at trial, the trial court correctly determined there was no written contract agreed to by the parties. Additionally, all parties contemplated a written consulting agreement from the beginning. Although he maintains he had an oral agreement, Mr. Nungesser admitted he knew a subsequent, final agreement would be forthcoming and was needed. He testified as follows:

> Q. . . . You understand that the terms discussed in that Letter of Interest could be modified, or eliminated altogether, before a final agreement was reached?

9

Q. Absolutely.

Q. And you knew, when you signed that Letter of Interest, that there would need to be a subsequent agreement between you and Newco, or whatever entity, before there would be any binding obligations?

A. I thought we had a deal when I left the restaurant and shook his hand. Mr. Moreno told Emile to get the lawyer and him to work out the details and the final document.

Q. But my question is, reading that document, you knew that it called for a subsequent definitive—

A. Right.

. . . .

Q. You were not aware of any binding written agreement signed by you and anyone else setting forth the terms and conditions of your relationship with any of the parties to this lawsuit, are you?

A. No.

The testimony supports the finding that such written agreement was a part of the bargain. Mr. Nungesser admitted he knew the discussed terms could change before a final agreement was reached. Therefore, an agreement to any terms could not be reached absent a final written contract.

Even if a written agreement was not part of the original bargain, an agreement still did not exist. "[T]he deeply entrenched requirement of our law [is] that there must be a meeting of the minds to consummate a binding agreement." *Boothe*, 425 So.2d at 314. Mr. Moreno, on behalf of Newco, believed there would be a period of due diligence by the parties and that there would not be an agreement until one was finalized in writing. Mr. Moreno had previously been involved in similar deals and acknowledged, "I mean, you always enter into these non-binding letters of intent with optimism and you don't do it unless you hope

10

that a deal can be consummated.  So yeah, we entered into this with good faith for sure."  Mr. Moreno later continued:

> Q.      You said you've executed a number [of] Letters of Interest before with other type[s of] deals, correct?
>
> A.      That's correct.
>
> Q.      Do the—Do you know if the economics that are set forth in the Letter of Interest are going to pan out, before you get to the final, when you execute the Letter of Interest?
>
> A.      They rarely do because, you know, it's—when you put something like this together, it's very high level and when you get through due diligence and you really get to fine tune what a final deal will look, and in this case a new company startup, then you get to make those kind of adjustments.  So rarely does it work out exactly from letter of intent to final document.  But that's the general intent, to try and get to somewhere in that, you know, range.  That's the goal that you start out with.
>
> Q.      So often many changes in terms of compensation and so forth between letter of intent and final deal?
>
> A.      Sure.  I mean, once you figure out what your costs are in a new startup business and, you know, how much overhead you're going to have, what the pricing in the market's going to allow, I mean, all those factors, you know, weigh into the final terms of a deal.

Additionally, Mr. Dumesnil explained the process of a deal and the purpose of an LOI:

> It's an ongoing discussion.  The LOI isn't something you do after ten minutes of a conversation.  So there's an exchange of ideas.  And so we don't waste too much time on lawyers and effort, I try and put these ideas out in a non-binding LOI just to make sure both parties are generally on the same page.

Mr. Dumesnil explained that the next step, after the LOI, is due diligence.  Specifically:

11

Because the LOI contemplated the forming of a Newco, so it's quite an endeavor. And it also contemplated that that Newco would invest quite a bit of money in portable living quarters. And so the—this—one of [the] parties was new to the market, the party—in the case of Mike Moreno—and the other party, in the case of Billy, had been in the market but had exited sometime before that and the market was moving rapidly. And so part of the due diligence was to figure out to define the market, what the customers look like, whether or not there was room for another portable living quarter company in the Gulf of Mexico, and then, probably as important as any of the others I just mentioned, whether or not these parties could work together.

There was no meeting of the minds between the parties to consummate a binding agreement at the first lunch meeting, other than that the parties would investigate whether the contemplated business would have a place in the market, what the costs would be for such a business, and what the terms of an agreement would look like. Based on the record, we find the trial court did not err in determining that there was no oral agreement between the parties, including with Mr. Moreno in his individual capacity.

However, Mr. Nungesser asserts that Arc accepted his performance under the terms of the agreement, thereby abandoning the writing requirement and consenting to the contract, which would rebut the presumption under La.Civ.Code art. 1947 that when the parties contemplate a specific form for the agreement, no agreement exists until executed in that form. Even where a written document is contemplated, when substantial performance under the agreement is conducted, such action may constitute consent to the contract under La.Civ.Code art. 1947. *See O'Glee*, 756 So.2d 1288.[2]

---

[2] This court notes that in *O'Glee*, 756 So.2d 1288, the parties also signed a "Buyer's document" and the buyers immediately began operating the café that was the subject of the sale

Mr. Nungesser points to the fact that he did perform consulting services, and that the trial court found he performed services for which he was awarded damages under the theory of unjust enrichment. Additionally, the LOI specified that Arc would dedicate a sales person to Mr. Nungesser, which it did—Michelle Citron; that Arc would develop marketing material for Mr. Nungesser, which it did—business cards, letterhead, shirts, and hats; and that the LOI contemplated Mr. Nungesser would be reimbursed for expenses and compensation, which it did, but later retracted. Mr. Nungesser provided testimony from Stephanie McNeese that the directive to issue the check to Mr. Nungesser would have had to come from Mr. Dumesnil, Mr. Moreno, or Mr. Jesus Moreno. However, she could not recall who approved the check being sent to Mr. Nungesser or who directed the fifteen percent calculation.

But, Mr. Dumesnil and Mr. Moreno both testified they understood there would be a due diligence period following the initial meeting. During the due diligence period, the parties would investigate whether the company could exist in the current market, and whether the parties could work together. Mr. Nungesser's work in marketing, reaching out to potential clients, and assisting in the design of buildings, which would be showcased to potential clients, is work that would be reasonable during this due diligence period. Additionally, Mr. Nungesser would logically need business cards and letterhead from Arc to send to prospective customers while investigating the market. It also makes sense that Arc would keep Mr. Nungesser informed of the marketing details for the new business because the due diligence period was a time for the parties to determine whether they could

---

as if it was their own, in conjunction with that document. The court maintained that the document coupled with the conduct was enough to prove a sale was consented to, despite the fact final "sales documents" were not executed.

work alongside one another. Finally, Mr. Moreno testified that Michelle Citron was assigned "to help and she was the one we chose to try to help put this together," which can be reasonably interpreted to suggest that Ms. Citron was another factor in the due diligence period.

Based on the record, a reasonable fact finder could conclude that Arc and Mr. Moreno operated under the belief that Mr. Nungesser's work during this time was part of the due diligence period as contemplated by the first meeting and LOI, and was not work being performed pursuant to a final consulting agreement.

"If the trial court's findings are reasonable when the record is reviewed in its entirety, the appellate court may not reverse them." *O'Glee* 756 So.2d at 1291. The facts and circumstances of this case show that the parties contemplated a due diligence period before executing a binding agreement. We find that the trial court's conclusion that there was no performance and acceptance of performance under a consulting contract was reasonable based on the record and witness credibility determinations. Therefore, we find that the trial court did not err in concluding Arc's acceptance of Mr. Nungesser's services during the due diligence period did not constitute consent to an agreement. Appellant's Assignment of Error Number One is without merit.

**Assignment of Error Number Two—Mr. Moreno's Individual Liability:**

In his second Assignment of Error, Mr. Nungesser argues that Mr. Moreno should be held individually liable for the breach of the alleged consulting agreement. For the reasons just discussed, Mr. Moreno would also not be individually liable to Mr. Nungesser because no contract existed between the parties. "[A] trial court's ruling on a motion for involuntary dismissal is reviewed

for manifest error." *Duncan v. Moreno Energy, Inc.*, 13-668, p. 10 (La.App 3 Cir. 12/11/13), 129 So.3d 849, 855, *writ denied*, 14-457 (La. 4/17/14), 138 So.3d 629.

Mr. Nungesser argues that Mr. Moreno was an undisclosed principle under La.Civ.Code art. 3017. Louisiana Civil Code Article 3017 (emphasis added) states: "A mandatary **who contracts** in his own name without disclosing his status as a mandatary binds himself personally for the performance of the contract." However, Mr. Moreno did disclose his status as a mandatary, and such status was even in the LOI when he signed on behalf of "Newco." "A mandatary who **enters into a contract** and discloses his status as a mandatary, though not his principal, binds himself personally for the performance of the contract. The mandatary ceases to be bound when the principal is disclosed." La.Civ.Code art. 3018 (emphasis added). No contract between the parties was entered into. Had the parties entered a consulting agreement after the due diligence period, Mr. Moreno would have needed to disclose the company that he was contracting for at that time.

Regardless, Mr. Nungesser testified he was never under the impression that Mr. Moreno was contracting in his individual capacity. In fact, he explained that it was his understanding that Mr. Moreno was representing "Newco," a "placeholder until they decided whether the portable building would be under ARC, Dynamic, or where exactly the buildings, as it progressed, would fit . . . ." Additionally, Mr. Nungesser was put on notice of the principal company he would be contracting with, if such a contract would be entered into, during the due diligence period. It was, or should have been clear to Mr. Nungesser which company would be housing the living quarters business, because Arc's marketing materials were used and Arc was inserted into the draft consulting agreements that were being exchanged.

Mr. Nungesser also argues Mr. Moreno should be liable to him under La.Civ.Code art. 1977, which states: "The object of a contract may be that a third person will incur an obligation or render a performance. The party who promised that obligation or performance is liable for damages if the third person does not bind himself or does not perform." Again, no contract existed between any party in this suit. The parties only contemplated exercising a period of due diligence, which they did. Mr. Moreno did not promise that Arc would bind itself to any obligation beyond determining whether a market existed for this new company and whether the parties could ultimately work together.

Thus, based on the facts of this case, we cannot say the trial court erred in determining that Mr. Moreno was not personally liable to Mr. Nungesser. Consequently, we find that Assignment of Error Number Two is also without merit.

**Assignment of Error Number Three—Unjust Enrichment:**

Both parties appeal the award of $50,000.00 to Mr. Nungesser for unjust enrichment—Mr. Nungesser argues the award should be increased based on fifteen percent of Arc's gross revenues, while Arc argues it was not unjustly enriched. Accordingly, we will first consider whether the trial court erred in finding Arc was unjustly enriched.

Louisiana Civil Code Article 2298 states: "A person who has been enriched without cause at the expense of another is bound to compensate that person. The term 'without cause' is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law." The five elements of an unjust enrichment claim are "(1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and resulting impoverishment, (4) an absence of 'justification' or 'cause' for the enrichment and impoverishment, and (5) no

other remedy at law available to plaintiff." *Dugas v. Thompson*, 11-178, p. 13 (La.App. 4 Cir. 6/29/11), 71 So.3d 1059, 1067-68.

In determining whether Mr. Nungesser proved the five elements of unjust enrichment, all factual findings of the trial court are reviewed under the manifest error standard of review. *Munro v. Carstensen*, 41,714 (La.App. 2 Cir. 12/20/06), 945 So.2d 961. "[To] reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous." *Cosby v. Holcomb Trucking, Inc.*, 05-470, pp. 12-13 (La. 9/6/06), 942 So.2d 471, 479.

Arc argues Mr. Nungesser failed to satisfy the absence of justification or cause element and failed to show that he was impoverished. Arc argues that the jurisprudence does not support a finding of unjust enrichment when the reason for the enrichment was a contract between the enrichee and a third party that justifies the enrichment of the enrichee.

For example, in *Liberty Personnel, Inc. v. Children's Hospital*, 487 So.2d 518 (La.App. 4 Cir. 1986), the fourth circuit found no unjust enrichment where the benefit received by one party was achieved through means not related to the services provided by the other party. In *Liberty Personnel, Inc.*, the plaintiff was an employment agency that received fees from employers who hired applicants referred by the agency. The defendant contacted the agency to find a director for its rehabilitation unit. The plaintiff referred one applicant, Deese, who was offered the position with the defendant but originally declined. One month later, Deese, who asserted she was no longer represented by the agency, contacted the defendant to work on a temporary basis for a different position and was hired. Plaintiff also

17

referred Byerly. However, Byerly became aware of the position through a newspaper ad prior to seeking assistance from the plaintiff. After using the plaintiff's services, she independently contacted the defendant for the position and was hired. Although the fourth circuit noted the issue of quantum meruit was not before the trial court, it concluded that there was no recovery for Plaintiff under this theory because both Dees and Byerly obtained positions through their own initiative.

Similarly, in this case, Arc asserts that its enrichment came from "the contracts between LQT [formally Arc] and its customers following Hurricanes Katrina and Rita" and "LQT's investment of skill, time, labor, financing and good fortune." Additionally, Arc counters Mr. Nungesser's argument that he trained Ms. Citron and ARC employees with the fact that Ms. Citron stopped working for Arc after only a few months, in May 2005, and that Mr. Nungesser also stopped working with Arc in July 2005. Therefore, Arc argues neither Ms. Citron nor Mr. Nungesser can be responsible for Arc's success in late 2005, 2006, or 2007.

Furthermore, Mr. Moreno testified that the company "moved on without any material involvement from Billy." Mr. Dumesnil recognized Mr. Nungesser provided two prospects to Arc, but stated that to the best of his knowledge, Mr. Nungesser's leads did not lead to any revenue. It was Mr. Dumesnil's opinion that Mr. Nungesser did not help in getting the portable living quarters business started, and did not push anything to the finish line, i.e., no effort towards revenue, contacts, or design of the buildings.

However, the trial court also heard testimony from Ms. Citron that Mr. Nungesser taught her everything she knows about the portable building business and that she could not have done the business without Mr. Nungesser. She

18

testified regarding meetings with Mr. Nungesser in which he sketched out designs and layouts for the buildings, and she specifically recalled a 2005 meeting with various Dynamic companies in Lafayette at which Mr. Nungesser gave a presentation. She also specifically recalls a 2005 Houston sales meeting that the Dynamic International sales representative attended. Ms. Citron testified she worked with Mr. Nungesser until May 2005.

Mr. Nungesser also testified to specific meetings he attended, that he gave his input into the design of the portable building layouts, and trained Arc employees on how to bid the building packages.

In its Reasons for Ruling (emphasis added) the trial court stated:

> Nungesser, on the other hand, paints a different picture **and establishes in this Court's mind that he was an integral part of the start-up of Arc's living quarters business**. Nungesser testified at trial about his extensive knowledge of what types of layout[s] would sell and used the knowledge and plans he had from General Marine to design new quarters. . . . He stated that after Katrina he had several customers who needed buildings, but that Arc did not have any available and was constantly behind on construction.
>
> . . . .
>
> First, Arc was enriched by Nungesser's knowledge of the industry and significant contacts with clients in the business. Nungesser provided Arc with the skills needed to develop the living quarters business and start-up of the company is due to his efforts. . . . [A]lthough it is unclear how much time was spent by Nungesser on this endeavor, it is clear that at least from the end of 2004 through part of 2005, Nungesser provided the groundwork that was fundamental to establishing the business.

We find no error in the trial court's summation of the evidence and conclusion that Mr. Nungesser contributed to Arc's success. Even if Arc was able to secure contracts with customers beyond Mr. Nungesser's time associated with

19

Arc, Arc had the know-how and designs, and potential customers were aware of Arc's portable living quarters endeavor, due at least in part to Mr. Nungesser's involvement.

Additionally, Arc's assertion that Mr. Nungesser was not impoverished is without merit. A person is "impoverished when assets are diminished, a 'justified expectation of gain' is prevented, or liabilities increased." *Munro*, 945 So.2d at 966. Mr. Nungesser gave his time and knowledge to Arc without compensation. The record shows that Arc was enriched by Mr. Nungesser's contribution of knowledge, ideas, and time in marketing, while Mr. Nungesser was impoverished by giving his time and knowledge without being compensated, and that there is a connection between the enrichment and impoverishment. Additionally, there is no justification or cause for the enrichment because, although Arc may have obtained some clients and contracts independently, Arc would not be in the position to gain those clients and contracts without the knowledge and marketing efforts of Mr. Nungesser. Lastly, because the trial court correctly found that there was no agreement between the parties, there is no other remedy at law available to Mr. Nungesser. We find no error in the trial court's determination that Arc was unjustly enriched. Consequently, we must now determine whether the trial court's award of $50,000.00 to Mr. Nungesser for unjust enrichment was appropriate.

Amount of Damages for Unjust Enrichment:

Under the theory of unjust enrichment, "[t]he amount of compensation due is measured by the extent to which one has been enriched or the other has been impoverished, *whichever is less*." La.Civ.Code art. 2298 (emphasis added). "In determining the actual value of . . . services, plus a fair profit, we note '[t]here is no specific test which must be applied to determine the reasonable value of such

services. It is a matter of equity depending upon the circumstances of each case.'" *Fogleman v. Cajun Bag & Supply Co.*, 93-1177, p. 7 (La.App. 3 Cir. 6/15/94), 638 So.2d 706, 710, *writ denied*, 94-1900 (La. 10/28/94), 644 So.2d 375 (quoting *Jones v. City of Lake Charles*, 295 So.2d 914, 917 (La.App. 3 Cir. 1974) (alteration in original)).

When determining damages in this case, the trial court commented on the "problem . . . in establishing the amount by which Arc was enriched by Nungesser's services." In reaching $50,000.00, the trial court notes that the "sole piece of evidence presented at trial showing Arc's living quarters revenue from 2005-2007 establishes that the company made $17,852,453.00 over the three year period. Nungesser seeks 15% of those revenues in the amount of $2,677,867.00; however, this too would be unjust." Therefore, the trial court was left to determine a fair value to compensate Mr. Nungesser for his contribution to Arc based on the testimony and evidence presented at trial.

Mr. Nungesser testified that he took part in the layouts for the first ten buildings Arc was going to build; met with the engineering company Arc was using, and formulated a price list. It was Mr. Nungesser's understanding this was the initial fleet that would be built. Additionally, Mr. Nungesser submitted expense reports into the record showing trips he took for meetings. The expense reports submitted into the record show approximately ten meetings Mr. Nungesser attended. The record also includes emails in which Mr. Nungesser either found a prospective client, or sent out information and packages on Arc living quarters. For instance, one email was dated November 17, 2005, from Mr. Nungesser to Jesus Moreno regarding a prospect for housing of 200 to 500 people in New Orleans. In another email, dated February 24, 2006, Mr. Nungesser announced he

21

received a call for twenty buildings. However, there is no indication as to whether Arc generated business from these prospects or the other contacts Mr. Nungesser provided information to.

The trial court specifically noted:

> This Court was presented with no evidence to help it establish the number of Nungesser's leads which generated actual sales for the company. It would be pure speculation on behalf of the Court to determine what percentage of the gross revenue for the company was actually attributable to Nungesser. Also, no evidence was presented as to the number of hours spent by Nungesser on behalf of the new company. Thus, this Court is left with deciding the value of Nungesser's services as a consultant/marketing representative from September 2004 through July 2005, based solely upon the testimony regarding the services Nungesser provided.

Mr. Nungesser only argues that his services are worth fifteen percent of Arc's gross revenues, and fifteen percent of the gross revenue is the only amount in the record representative of what Mr. Nungesser's services were worth. Additionally, the trial court believed Mr. Nungesser only rendered services through July 2005. Although emails introduced at trial show Mr. Nungesser was still receiving requests regarding building availability through February 2006, nothing in the record evidences that Mr. Nungesser did any work to receive those requests during those months. Additionally, Mr. Nungesser only provided expense reports from January 2005, through July 2005. Therefore, we find no manifest error in the trial court's determination that Mr. Nungesser is due compensation for his work for Arc from September 2004, through July 2005.

"Since the assessment of an award based on the doctrine of unjust enrichment . . . is analogous to an award of damages, the record must clearly reveal the trial court abused its discretion before we will disturb the award." *Bieber-*

22

*Guillory v. Aswell*, 98-559, p. 10 (La.App 3 Cir. 12/30/98), 723 So.2d 1145, 1151. The role of the appellate court "is not to decide what we consider an appropriate award, but rather to review the exercise of discretion by the trial court. 'Each case is different and the adequacy and inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.'" *Id.* (quoting *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1260 (La.1993)).

Arc's living quarters revenue was $598,374 for 2005. Compensation based on fifteen percent of Arc's average living quarters revenue for the months of 2005 that Mr. Nungesser worked with Arc would be $52,357.73 ($598,375 equals an average of $49,864.5 per month in 2005 for ARC, and Mr. Nungesser provided work for seven months during 2005). Considering it is unlikely Arc would have seen little, if any, revenue in the early months of its involvement in the portable living quarters business, and considering the trial court was tasked with determining a reasonable value for Mr. Nungesser's services as a matter of equity depending on the circumstances of the case, we cannot say that an award of $50,000.00 for Mr. Nungesser's services is unreasonable. We find no abuse of discretion in the amount of the trial court's award to Mr. Nungesser for unjust enrichment.

## Assignment of Error Number Four—Trial Court's Denial of Mr. Nungesser's Motion to Compel:

Mr. Nungesser's Assignment of Error Number Four addresses the trial court's decision to deny Mr. Nungesser's August 2009 Motion to Compel. At the time, Mr. Nungesser had not made a claim for unjust enrichment. The hearing on the motion took place on November 9, 2009, and, relevant here, the trial court denied Mr. Nungesser's motion as to interrogatory number nine and request for

production number thirteen. Mr. Nungesser sought a supervisory writ on the denial, docket number 09-1492 in this court, and this court denied the writ.

Trial courts are given wide discretion in ruling on discovery matters, and an appellate court should not upset a trial court's ruling absent an abuse of discretion. *St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc., L.L.C.*, 14-286 (La.App. 4 Cir. 8/27/14), 147 So.3d 1266, *writ denied*, 14-2019 (La. 10/31/14), 152 So.3d 1600.

Interrogatory number nine sought the names and addresses of all persons or entities to which Arc sold or leased any offshore leasing quarters from January 1, 2004, through the date of discovery. Request for production number thirteen sought copies of all customer lists, prospect lists, invoices, order forms, price quotes, and any documentation evidencing persons to whom Arc sold or leased offshore living quarters from January 1, 2004, through the date of discovery. While Mr. Nungesser was provided with Arc's annual revenue figures subject to a confidentiality agreement, Arc refused to provide the remaining information.

Mr. Nungesser argues that, had he had access to Arc's client lists, he could have provided the trial court information regarding the number of his leads which generated actual sales for the company and may support his entitlement to damages for unjust enrichment. However, at the time this motion to compel was heard, Mr. Nungesser had not made a claim for unjust enrichment. Instead, he only sought a percentage of gross revenues as allegedly set forth in a contract. To calculate the percentage, only Arc's income would need to be established, not the number of customers Arc had because of any of Mr. Nungesser's leads. Mr. Nungesser did not re-urge his motion or seek this information after amending his petition for damages to add a claim for unjust enrichment. Therefore, we find that the trial

court did not abuse its discretion in denying this information at the time. Mr. Nungesser's Assignment of Error Number Four is without merit.

**Assignment of Error Number Five—Trial Court's Refusal to admit Nungesser Proffer #1:**

Nungesser Proffer #1 is an Excel sheet sent via email from Mr. Dumesnil to Mr. Nungesser for purposes of settlement. The Excel sheet contains the monthly living quarter revenue for each month from July 2005 through December 2005, as well as what fifteen percent of the monthly revenue equals. The Excel sheet only contains the total revenue per month, without any justification or support for the total number. Additionally, the attachment includes a "suggested settlement" offer.

As previously stated, trial courts' rulings on discovery matters are reviewed for an abuse of discretion. *St. Bernard Port, Harbor & Terminal Dist.*, 147 So.3d 1266.

Mr. Nungesser argues the Excel sheet is relevant to two issues. "First, it sets forth the gross revenues for Arc's building business for 2005. Second, it shows that Arc continued to operate under the understanding that Mr. Nungesser was to receive a commission of 15% of gross living quarters revenue." Louisiana Code of Evidence Article 408 prohibits admitting evidence of an offer "to furnish . . . anything of value in . . . attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability of the claim or its amount." Based on the trial transcript, it appears the only purpose the Proffer was going to serve was to show that Arc attempted to buy Mr. Nungesser out by using an offer of fifteen percent of the gross revenues. The document was not used to show what the gross revenue breaks down to for each month of 2005. Any suggestion by Mr. Dumesnil that Mr. Nungesser be paid fifteen percent is part of a

25

settlement offer. Therefore, the trial court did not abuse its discretion in not allowing the Proffer to be admitted to prove Arc operated under the belief Mr. Nungesser was owed fifteen percent of gross revenues. Additionally, the Proffer was unnecessary to show Arc's gross revenues for 2005 because Arc previously provided its annual gross income to Mr. Nungesser in discovery and Mr. Moreno testified to Arc's gross income at trial. We find that this Assignment of Error is also without merit.

## CONCLUSION

For these reasons, the judgment of the trial court is affirmed. In regards to costs of this appeal, appellate courts have the power to tax appellate costs "against any party to the suit, as in its judgment may be considered equitable." La.Code Civ.P. art. 2164. Appellant, Mr. Nungesser, was ultimately unsuccessful on all issues raised by him on appeal. However, LQT Industries, L.L.C. and Dynamic Industries, Inc. also answered the appeal, requesting the damages awarded Mr. Nungesser by the trial court be set aside. LQT Industries and Dynamic Industries were unsuccessful on this issue. On the other hand, Michel Moreno was successful at the trial level, as well as on appeal. Mr. Moreno did not appeal the trial court's judgment and was only forced to file an opposition because Mr. Nungesser appealed. Therefore, LQT Industries, L.L.C. and Dynamic Industries, Inc. shall bear their own costs of this appeal, and the remainder of the costs of this appeal shall be borne by William Nungesser.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.

26